# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs April 8, 2013

## IN RE ALYSSA Y. ET AL.

### Appeal from the Juvenile Court for Knox County
### No. 104308    Timothy E. Irwin, Judge

### No. E2012-02274-COA-R3-PT - Filed June 17, 2013

This is a termination of parental rights case, focusing on Alyssa Y. and Brian Y. ("the Children"), the minor twin children of Juanita Y. ("Mother"). When the Children were three months old, their maternal grandmother filed a petition with the Knox County Juvenile Court, asserting that the Children were dependent and neglected due to Mother's drug use. The Children were placed in the custody of the maternal grandmother by order of the court entered January 23, 2009. When the maternal grandmother became unable to care for the Children in November 2010, they were taken into custody by the Tennessee Department of Children's Services ("DCS") and placed in foster care. DCS filed a petition to terminate the parental rights of Mother on April 26, 2012. The petition alleged several grounds for termination, including abandonment based on Mother's willful failure to visit and support the Children, persistent conditions, and substantial noncompliance with the permanency plan. Following a bench trial, the trial court granted the petition after finding by clear and convincing evidence that Mother had abandoned the Children due to her failure to pay child support. The court also found clear and convincing evidence that Mother had failed to substantially comply with the permanency plan and that termination of parental rights was in the Children's best interest. Mother has appealed. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Heather G. Inman, Knoxville, Tennessee, for the appellant, Juanita Y.

Robert E. Cooper, Jr., Attorney General and Reporter, and Mary Byrd Ferrara, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of

Children's Services.

**OPINION**

I.  Factual and Procedural Background

The Children were born on July 7, 2008.  At the time, Mother was living with the Children's biological father, but the parents were not married.[1]  When custody of the Children was removed from Mother in January 2009 and placed with the maternal grandmother, the court entered a no-contact order against Mother.  In July 2009, while the Children were still in the custody of the maternal grandmother, Mother gave birth to another child.  That child was immediately removed from Mother's care and custody because Mother tested positive for cocaine upon the child's birth.  In September 2009, Mother was permitted to begin supervised visits with the Children.  The maternal grandmother provided care for the Children until November 2010, at which time she was no longer able to continue because her own mother needed assistance.  When the maternal grandmother contacted DCS, the agency acquired temporary custody of the Children on November 5, 2010.  Mother testified she was unaware that DCS had acquired custody of the Children until the caseworker contacted her shortly after the Children were placed in DCS custody.  Mother met with the caseworker and other DCS employees on December 3, 2010, thereby participating in the development of a permanency plan.  Mother admitted she was using crack cocaine at that time.

The initial permanency plan noted that Mother was struggling with the challenge of drug addiction and listed her freedom from drugs and alcohol as a desired outcome.  The permanency plan established several goals for Mother, including that she have a drug and alcohol assessment and follow any recommended treatment.  The plan also required Mother, during such treatment, to identify stressors that had led her to abuse drugs and to work with her therapist to develop a relapse prevention plan.  The permanency plan requirements further obligated Mother to submit to random drug screens, refrain from associating with known drug users, have a mental health assessment and follow all recommendations, provide a safe and stable home, maintain contact with DCS, pay child support of $40 per month, visit the Children  regularly, take parenting classes, and demonstrate appropriate parenting skills.

A second permanency plan with similar requirements was developed on September 1, 2011.  This plan specifically provided that Mother continue with her substance abuse program at Helen Ross McNabb until successfully released and follow all aftercare recommendations.  Other plan requirements included Mother maintaining contact with her

---

[1]  The parental rights of the biological father were terminated through independent proceedings.

case manager and allowing the case manager to visit her home to determine if it was appropriate for the Children. Mother was also required, *inter alia*, to continue visiting the Children and paying child support of $40 per month.

At some point in 2011, Mother informed the case manager that she was seriously dating a person named Brian L. This man was included in Mother's meetings with DCS. Brian L. failed a drug screen and was asked to submit to a hair follicle test. He did not comply. Mother was informed that she could not have the Children around Brian L. until he was able to demonstrate that he was drug-free.

As Mother had shown great progress toward her permanency plan requirements by late 2011, a trial home placement began on December 2, 2011. At the time, Mother was renting a home in Oak Ridge, which the case manager deemed an appropriate residence for the Children. The maternal grandmother also was living with Mother, and was available to provide care for the Children while Mother was at work. The evidence reflects that Mother was working thirty-five to forty hours per week at Bread Box during this period.

On December 11, 2011, the DCS case manager, Ms. Lawrence, made a random visit to Mother's home to check on the Children. She found that they had been left there alone with Brian L. Ms. Lawrence was told by Brian L. that the maternal grandmother had been called away on a family emergency and had contacted him to care for the Children until Mother returned home from work. Ms. Lawrence called Mother, instructing her to come home immediately. Mother complied. Because Mother claimed to have no knowledge that Brian L. had been asked to stay with the Children, Ms. Lawrence allowed the trial home placement to continue.

Several days later, Ms. Lawrence made another home visit to deliver Christmas gifts for the Children. At this time, Ms. Lawrence requested that Mother submit to a drug screen, the results of which were positive. Mother claimed she had taken a hydrocodone that was left from a prescription. Ms. Lawrence directed that Mother proceed to the laboratory for an additional screen. The laboratory screen similarly showed that Mother tested positive for hydrocodone and hydromorphone. As a consequence, the trial home placement was disrupted, and the Children were returned to foster care on December 19, 2011.

DCS convened a Child and Family Team Meeting on December 21, 2011, during which Mother was told that she needed to present three months of clean drug screens in order to regain custody. Thereafter, Mother did not maintain contact with Ms. Lawrence. She also did not appear for a scheduled court hearing or her visit with the Children in January 2012. Mother admitted that she relapsed in January 2012, blaming her regression on the stress of having the Children removed at Christmas and her father's recent death. Despite Ms.

Lawrence's attempt to locate Mother by phone and through family members, she was unable to do so. Ms. Lawrence did not hear from Mother until March 21, 2012, at which time Mother called, indicating she desired the Children's return. A meeting was scheduled between Mother and DCS on April 4, 2012. By agreement, Mother was allowed to begin visiting the Children again on April 11, 2012. DCS subsequently filed the petition seeking termination of Mother's parental rights on April 26, 2012.

A bench trial was conducted over the span of three non-consecutive days. Following the trial, the court entered an order that included extensive findings of fact with reference to termination of Mother's parental rights. The court found that the statutory grounds of abandonment for failure to support and substantial noncompliance with the permanency plan had been proven by clear and convincing evidence. The court also found, based on clear and convincing evidence, that termination was in the Children's best interest. Mother timely appealed.

## II. Issues Presented

Mother presents the following issues for our review:

1.  Whether the trial court properly concluded that Mother failed to substantially comply with the requirements of the permanency plan.

2.  Whether the trial court properly concluded that Mother abandoned her children by failing to pay child support for four months prior to the filing of the termination petition.

3.  Whether the trial court properly concluded that DCS made reasonable efforts to assist Mother in the completion of the tasks identified by her permanency plan.

4.  Whether the trial court properly concluded that it was in the best interest of the Children to terminate Mother's parental rights.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *Id.*;

Tenn. R. App. P. 13(d). Questions of law, however, are reviewed *de novo* with no presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586 (Tenn. 2010). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has instructed:

> In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36–1–113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36–1–113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State Dep't of Children's Servs. v. Mims* (In re N.B.), 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

IV. Substantial Noncompliance with Permanency Plan

The trial court terminated Mother's parental rights, *inter alia*, on the ground that she failed to substantially comply with the reasonable responsibilities set out in her permanency plan. Tennessee Code Annotated § 36-1-113(g)(2) (Supp. 2012) provides, as relevant to this

action, as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

. . .

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4.

In its findings regarding Mother's efforts under the permanency plan, the trial court stated in relevant portion:

Permanency plans were developed for the mother and the children on December 3, 2010 and September 1, 2011. Among other things, the permanency plans required the mother to: (a) complete an alcohol and drug assessment, comply with resulting treatment recommendations, identify stressors that led to substance abuse, work with a therapist to develop a relapse prevention plan, refrain from associating with known drug users, and demonstrate sobriety by passing random drug screens; (b) complete a mental health assessment, comply with any resulting treatment recommendations, and address domestic violence issues in counseling along with any other issues identified during the assessment; (c) have a legal source of income and safe, stable housing free from environmental hazards, illegal activity, drug use, domestic violence, or other risks to the children; and (d) attend and successfully complete age-appropriate parenting classes and demonstrate appropriate parenting and the ability to provide a structured environment for the children. With the assistance of DCS, the mother substantially complied with the tasks on the plan; Case Manager Lawrence assisted the mother with referrals for Alcohol and Drug assessments, urine drug screening, hair follicle drug screening, referrals for mental health treatment, referrals for parenting classes, visitation, on-going case management, in-home services and a trial home placement.

A trial home placement was started with the mother and the children on December 2, 2011.

. . .

The trial home placement was disrupted on December 21, 2011. Respondent was advised, during a Child and Family Team Meeting held that day, that she needed to have clean drug screens for three months, cease any use of narcotic pain medication, advise her physician of her addiction and provide copies of any prescriptions to the Department and maintain her progress that she had otherwise made on the plan. Case Manager [Lawrence] discussed Alcohol and Drug treatment with the mother and referred her to Child and Family of Tennessee and Hope of East Tennessee.

A visit was subsequently scheduled via text message for January 201[2] and the mother failed to appear for that scheduled visitation. The mother then failed to respond to communication with Case Manager Lawrence and failed to appear at scheduled Court hearings and other meetings regarding the children. Case Manager Lawrence attempted to contact the mother through her contacts with the family and through the contact information that she had for the mother. Respondent's family was also concerned about the mother's whereabouts and condition. Respondent relapsed on cocaine in January 2012.

. . .

Respondent provided documentation of an Alcohol and Drug Assessment conducted by Mike Stickford, which she submitted to on July 23, 2012. Respondent did not disclose her relapse in January and February 2012. The documentation showed that she stated that she had not used any substances in the previous eighteen months. Mr. Stickford testified that this relapse information would have been important to his assessment of Respondent's needs. Respondent provided documentation of a second Alcohol and Drug Assessment conducted by John West on August 16, 2012. Respondent did disclose her relapse in February 2012, but failed to disclose her omissions during the previous assessment with Mr. Stickford and failed to disclose that she had refused to provide a urine sample for drug screening on July 25, 2012.

Respondent was ordered to submit to a urine drug screen on July 25, 2012, to be performed by the Knox County Juvenile Court staff, Shanna Cheatam. Respondent initially indicated that she was ready to provide the sample; however, when instructed on how to provide said sample, Respondent could not urinate. Respondent failed to provide a urine sample for drug screening on that date, which the Court found to be a "failed" drug screen. . . .

-7-

[T]he Court finds that Respondent has failed to comply in a substantial manner with those reasonable responsibilities set out in the permanency plans related to remedying the conditions which necessitate foster care placement.

(Paragraph numbers omitted.)

Regarding a parent's substantial noncompliance with a permanency plan, as this Court has previously explained:

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance.

*In re M.J.B.*, 140 S.W.3d 643, 656-57 (Tenn. Ct. App. 2004) (internal citations omitted).

Mother's latest permanency plan, developed on September 1, 2011, provided that Mother needed to be alcohol and drug free in order to parent the Children appropriately. This plan recognized that Mother had completed outpatient treatment at Helen Ross McNabb for her substance abuse issues and required that she continue with the program until successfully released. Mother's responsibilities under the plan also included her following all aftercare recommendations, including the attendance of two NA meetings per week. Mother was also required to submit to and pass random drug screens.

The plan further noted that Mother had not parented the Children in two years and therefore would need to demonstrate appropriate parenting skills. Mother's responsibilities under the permanency plan also required her to maintain her employment and housing, allow the case manager to visit her home to determine if it was appropriate for the Children, get her driver's license reinstated, continue visiting the Children, and remain in contact with the case manager. Mother was further responsible for following the mental health recommendations and paying child support of $40 per month. The trial court found, and the evidence supports such finding, that all of these requirements were "reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *See M.J.B.*, 140 S.W.3d at 656-57.

One of the essential goals of the parenting plan was for Mother to demonstrate that she was free of drugs so that she could appropriately parent the Children. Mother attended an outpatient drug rehabilitation program at Helen Ross McNabb in 2011 but failed some of the drug screens administered by that program in March and April 2011. Despite those failed drug screens, Mother successfully completed the program and was released to pursue aftercare in June 2011. Mother was allowed to have a trial home placement with the Children in December 2011, but that placement was disrupted after Mother failed two drug screens. Mother admittedly relapsed thereafter, resuming her use of cocaine. Ms. Lawrence was unable to locate Mother from January 1, 2012, to March 21, 2012. At the time of trial, Mother had allegedly been drug-free since February 2012. A hair follicle test administered to Mother on May 17, 2012, with a ninety-day time frame, was positive for cocaine. A subsequent hair follicle test administered on June 5, 2012, incorporating a sixty-day time frame, was negative.

At the conclusion of the first day of testimony in the termination hearing on July 25, 2012, Mother was ordered by the trial court to submit to a drug screen. With reference to the screen, Mother claimed she was unable to urinate. The court officer who was administering the test stated in pertinent part:

> When we initially went to the bathroom, there was an urgency to go, and then [Mother] sat down on the toilet and put her hands between her legs, but I didn't see a stream . . . so I asked her to remove her hands and to squat over the toilet initially, so I could see a urine stream into the cup. At that point, she couldn't go.

When questioned regarding the significance of being able to view the urine stream, the witness explained that this ensured that the urine stream was natural, rather than coming from a condom or other object placed in the woman's body. When Mother refused to provide a urine sample, the trial court considered the refusal to be a failed test.

In addition, the trial court afforded little credence to Mother's eleventh-hour drug and alcohol assessments obtained on the eve of trial as she had not been completely honest with the providers. At the time of trial, Mother's most recent efforts toward dealing with her addiction were to attend weekly NA meetings and two sessions with Mr. West. Mother testified that she felt she no longer had a drug problem. Given the severity and longevity of Mother's drug problem, her efforts appear minimal at best.

An additional permanency plan goal required Mother to have safe and stable housing. She testified, however, that she was in the process of moving from her prior home in Oak Ridge. Mother had recently resumed visitation in April 2012, having last visited the Children

in December 2011. Mother did not maintain contact with Ms. Lawrence, the latter being unable to find Mother from January to March 2012. In addition, Mother failed to get her driver's license reinstated and failed to maintain stable employment, instead moving from job to job. Mother also failed to make any child support payments whatsoever.

As this Court has previously stated with reference to substantial noncompliance with permanency plan requirements:

> All of these requirements were in place to achieve one ultimate goal: for Mother to provide a safe and stable environment to properly raise her children. In fact, the permanency plan listed as an expected goal that Mother "will have a suitable home life for her children. [Mother] will demonstrate that she can provide a stable home life for her children by maintaining stability in her own life and complying with this plan of care until permanency is achieved." It makes no difference how many parenting classes are completed if the parent is incapable or unwilling to learn anything from the classes and adjust his or her behavior accordingly. While we believe Mother did complete many of the physical requirements of the plan by attending parenting classes and the like, she did not accomplish any of the goals of the plan. In addition, as noted above there were several important specific requirements of the plan that Mother did not comply with, such as staying drug and alcohol free. The evidence does not preponderate against the factual findings of the Juvenile Court. We further conclude that the facts as found by the Juvenile Court are such that we cannot conclude the Juvenile Court erred when it held there was clear and convincing evidence that Mother had failed to substantially comply with the terms of the permanency plan.

*State Dep't of Children's Servs. v. C.D.W.*, E2004-00623-COA-R3-PT, 2005 WL 94468 at *10 (Tenn. Ct. App. Jan. 11, 2005).

Similarly, in the case at bar, Mother complied with some of the requirements of her permanency plan but fell far short of achieving the plan's ultimate goal. Mother obtained alcohol and drug assessments and followed through with the recommended treatment, but she relapsed thereafter. Mother obtained safe and stable housing, but she was in the process of moving at the time of trial. Mother maintained a job at the time of trial, but she had changed employers no less than four times in the previous year. Mother did exercise periods of coparenting that were successful, but she also presented occasions when she failed to visit and could not be found by the case manager. Mother's trial home placement lasted only a matter of days before being disrupted due to her drug use. These Children were four years old at the time of trial and had only been parented by Mother for a total of approximately

three months of their lives. In short, while Mother completed some of the requirements of the plan, she failed to demonstrate accomplishment of the plan's overriding objective, which was that she provide a safe and stable environment to properly raise her children.

Mother contends that the trial court failed to consider the serious nature of drug addiction and relies upon the case of *In re M.J.M., Jr.*, M2004-02377-COA-R3-PT, 2005 WL 873302 (Tenn. Ct. App. Apr. 14, 2005). Mother asserts that, like the parent in *M.J.M., Jr.*, she worked her plan vigorously and continued to do so until the time of trial, such that her efforts should not be dismissed as "too little, too late." *Id*. at *10. In *M.J.M., Jr.*, however, the mother was given only six months to fulfill the requirements of the permanency plan before a petition to terminate was filed. The Court found such to be insufficient time to allow the mother to address her drug problem. *Id*. In the present action, Mother had eighteen months to substantially comply with the requirements of her permanency plan but failed to do so. *M.J.M., Jr.*, is factually distinguishable, and Mother's reliance thereon is misplaced. *See Id*. We conclude that the trial court did not err in holding that there existed clear and convincing evidence that Mother failed to substantially comply with the terms of the permanency plan.

## V. Abandonment - Failure to Support

The trial court also found clear and convincing evidence that Mother abandoned the Children by failing to pay child support for four months preceding the filing of the petition to terminate. Tennessee Code Annotated § 36-1-113(g)(1) authorizes termination of parental rights when:

> Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred . . . .

Tennessee Code Annotated § 36-1-102(1)(A)(i) (2010) defines abandonment, in relevant part, as:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child . . . .

Pursuant to the statute, the court must find that a parent's failure to visit or support was willful. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). As this Court has

previously explained:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.

*In re Audrey S.*, 182 S.W.3d at 863.

Failure to visit or support a child is willful when a person is "aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at 864. This Court further explained:

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* (citations omitted).

Mother contends that the trial court erred in finding that her failure to support was willful. She specifically asserts that she was financially unable to pay any support due to her periodic lack of employment and resulting lack of income. She also urges that she cannot be found to have failed to support the Children because her tax refund was intercepted and applied to her child support obligation. We disagree.

The trial court made the following pertinent findings regarding the issue of willful failure to support:

> [Mother] has been employed cleaning houses, at the Breadbox convenience store, Kentucky Fried Chicken, Chili's and Silver Spoon. [Mother] testified that she earned enough to pay $750 per month in rent and her other monthly bills. [Mother] testified that she did not pay any child support in the four months prior to the Petition for Termination of Parental Rights being filed, or between December 26, 2011 and April 26, 2012.
>
> Upon these facts, the Court finds that [Mother] has abandoned these children in that [Mother] has willfully failed to support or make reasonable payments

-12-

toward the support of the children for four (4) consecutive months immediately preceding the filing of the petition in this cause. [Mother] failed to make any payments of child support in the four months prior to the filing of the Termination of Parental Rights Petition, between December 26, 2011 and April 26, 2012. The Court finds that [Mother] had the ability to pay child support for the children as evidenced by her continued employment history and her ability to pay her monthly bills.

(Paragraph numbers omitted.)

Mother was required to pay child support of $40 per month. The trial court found that Mother's failure to pay support was willful. We agree. Mother admitted she was working thirty-five to forty hours per week at Breadbox from June 2011 to December 2011, at which time she left to accept a better job at Kentucky Fried Chicken. Mother testified that she earned $8.50 per hour at Breadbox and $11.00 per hour at Kentucky Fried Chicken. Mother subsequently left her employment with Kentucky Fried Chicken in mid-January 2012 when she experienced a drug-related relapse. Mother next worked cleaning homes for a period of time during which she earned $200-250 per week. By the time of trial in August 2012, Mother had begun employment at Chili's. In October 2012, Mother was working at Silver Spoon restaurant. Mother's employment history evinced that she had worked somewhat consistently for at least ten months prior to the termination petition being filed.

More significantly, Mother admitted that she was able to support herself and pay her bills during the respective time frame. The evidence supports the finding that Mother rented a house in Oak Ridge, for which she paid $750 per month. She also paid personal utility bills. In addition, Mother paid for various items identified by her permanency plan, such as drug assessments, rather than seeking assistance from DCS. It is also relevant that Mother was somehow financially able to procure cocaine and other drugs at various times during the custody period.

The fact that Mother's tax refund was intercepted and applied to her child support obligation is not relevant. *In re Lavanie L.*, E2008-02622-COA-R3-PT, 2009 WL 3231091 at *6 (Tenn. Ct. App. Oct. 8, 2009). As this Court noted in *Lavanie*, the interception of a tax refund does not constitute a voluntary payment of child support. *Id.* Further, the fact that Mother was due a tax refund shows that she had earnings from which support could have been paid. *Id.*

This Court has often held that a parent's demeanor and credibility as a witness "play an important role in determining intent, and trial courts are accordingly in the best position to make such determinations." *See, e.g., In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Further, as Tennessee Code Annotated § 36-1-102(1)(G) expressly provides: "it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made." The trial court found by clear and convincing evidence that Mother willfully failed to support the Children during the relevant reasonable period. Upon our careful review, we conclude that the trial court's findings, made under the clear and convincing standard, are supported by a preponderance of the evidence. This ground for termination of parental rights must likewise be affirmed.

## VI. Reasonable Efforts by DCS

Mother next argues that the trial court erred in finding that DCS made reasonable efforts to reunify Mother with the Children and therefore erred in terminating Mother's parental rights based on substantial noncompliance with the parenting plan. The trial court found that DCS made such reasonable efforts in this case. We agree.

We have previously defined such reasonable efforts as:

"the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." T.C.A. § 37-1-166(g)(1) (2005). "Reasonable efforts entail more than simply providing parents with a list of service providers and sending them on their way. The Department's employees must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not." *In re C.M.M.*, 2004 WL 438326, at *7 (citing *In re D.D.V.*, No. M2001-02282-COA-R3-JV, 2002 WL 225891, at *8 (Tenn. Ct. App. Feb.14, 2002)). The Department's efforts, however, need not be "Herculean," and it is important to note that "the remedial responsibility does not rest solely on the Department's shoulders. Parents must also make reasonable efforts to rehabilitate themselves and to remedy the conditions that required them to be separated from their children." *Id.* (citing *In re R.C.V.*, No. W2001-02102-COA-R3-JV, 2002 WL 31730899, at *12 (Tenn. Ct. App. Nov.18, 2002)). The State has the burden of proving by clear and convincing evidence that its efforts at reunification were reasonable under all of the circumstances. *Id.* at *8; *see* T.C.A. § 36-1-113(c) (2005).

*State Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 800-01 (Tenn. Ct. App. 2008).

The trial court found that DCS assisted Mother by providing "referrals for Alcohol

and Drug Assessments, urine drug screening, hair follicle drug screening, referrals for mental health treatment, referrals for parenting classes, visitation, on-going case management, in-home services and a trial home placement." The evidence supports these findings. Mother posits that DCS failed to provide reasonable efforts because Ms. Lawrence did not inform her of the Children's medical or therapy appointments in the months prior to termination and did not allow her as much visitation. Mother asserts in her brief on appeal that after her relapse in January 2012, DCS effectively "wrote her off." We disagree.

The evidence demonstrates that DCS gave assistance to Mother to the extent Mother would accept it. DCS provided Mother with referrals and arranged for services for Mother in certain instances, but as Ms. Lawrence testified, Mother often chose to do things her own way. Mother admitted that she did not ask DCS for assistance. Ms. Lawrence testified that she provided Mother with information regarding the Children's appointments when she could reach her. DCS was still offering visits for Mother until the date of termination of parental rights. DCS clearly exercised "reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family" in this case. *See* Tenn. Code Ann. §37-1-166(g)(1). Mother's argument regarding this issue is without merit.

## VII. Best Interest of the Children

Finally, Mother contends that DCS failed to show by clear and convincing evidence that termination of her parental rights was in the Children's best interest. Again, we disagree. When at least one ground for termination of parental rights has been established, as here, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the Children's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found unfit by establishment of a ground for termination, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877.

Tennessee Code Annotated § 36-1-113(i) (Supp. 2012) provides a list of factors the trial court is to consider when determining if termination is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.*, 182 S.W.3d at 878. Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White*, 171 S.W.3d at 194.

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

> (1) Whether the parent or guardian has made such an adjustment
> of circumstance, conduct, or conditions as to make it safe and in

the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In the instant action, the trial court considered the above factors and found in pertinent

part as follows:

> [Mother] has not made such an adjustment of circumstance, conduct or conditions as to make it safe and in the children's best interest to be in her home despite reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible; that [Mother] has not made such an adjustment of circumstance, conduct or conditions as to make it safe and in the children's best interest to be in her home; that [Mother] has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible; that there is such use of alcohol or controlled substances as may render [Mother] consistently unable to care for the children in a safe and stable manner; that [Mother] has not paid child support consistent with the child support guidelines promulgated by the Department of Human Services pursuant to T.C.A. 36-5-101.

> . . .

> The children are entitled to a safe, secure and loving home. The children have found such a home with their foster family where they are thriving.

> It is, therefore, in the best interest of [the Children] and the public that all of [Mother's] parental rights to these children be terminated and the complete custody, control, and full guardianship of the children be awarded to the State of Tennessee, Department of Children's Services, with the right to place them for adoption and to consent to such adoption in loco parentis.

The evidence in the record of this cause supports these findings. Mother had not made such an adjustment of circumstance, conduct, or conditions so as to make it safe and in the Children's best interest to be in her home. This was true despite Mother having participated in a drug rehabilitation program and having received other available social services. The Children had been in the custody of others for most of their lives, and Mother never successfully dealt with her drug problem. The proof showed that Mother had been abusing drugs for several years yet did not think she had a problem at the time of trial and was making little effort to address this issue. A lasting adjustment does not reasonably appear possible.

Mother had visited with the Children somewhat regularly, although she did not visit for a three- to four-month period during her cocaine relapse. The proof established Mother had a meaningful relationship with the Children prior to the trial home placement. There was

no evidence regarding whether a meaningful relationship existed by the time of trial. The proof showed that the foster parents and the Children were very bonded to one another. By trial, the Children had resided with the foster parents for over a year and were doing well in that placement. The foster parents testified that they loved the Children and planned to adopt them. A change of caretakers at this point would likely be detrimental to the Children both physically and emotionally.

The proof further established that Mother had been unable to safely and appropriately parent the Children for more than a few days during the trial home placement, which placement was disrupted due to Mother's drug use. Mother also failed to keep Brian L. away from the Children as instructed. She was still "seeing" him and dependent on him for transportation at the time of trial. Mother had moved from the home that was approved by the case manager and had not yet relocated to her new home by the time of trial. Finally, Mother admitted she had not paid child support. From our examination of the record before us, we determine that there is clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest.

## VIII. Conclusion

The judgment of the trial court terminating the parental rights of Mother is affirmed. Costs on appeal are taxed to appellant, Juanita Y. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE

-18-